UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN THE MATTER OF AN APPLICATION OF THE UNITED STATES FOR AUTHORIZATION TO: | ) ) ) **FILED UNDER SEAL** |
| | ) M.J. Docket Nos. |
| 1.  OBTAIN A CRIMINAL COMPLAINT AGAINST DOMINGO GARCIA SUERO; | ) ) 17-MJ-1221-DLC |
| 2.  OBTAIN A SEARCH WARRANT FOR  A 2004 GRAY TOYOTA CAMRY WITH MASSACHUSETTS REGISTRATION 6BWD30 AND VEHICLE IDENTIFICATION NUMBER JTDBE32K440274334; | ) ) ) 17-MJ-1222-DLC ) ) ) |
| 3.  OBTAIN A SEARCH WARRANT FOR THE PREMISES AT 23 HAMILTON AVENUE, BASEMENT APARTMENT, HAVERHILL, MASSACHUSETTS; | ) ) 17-MJ-1223-DLC ) ) |
| 4.  OBTAIN A SEARCH WARRANT FOR THE PREMISES AT 316 ADAMS STREET, APT. #189, LOWELL, MA; | ) 17-MJ-1224-DLC ) ) |
| 5.  OBTAIN A SEARCH WARRANT FOR THE PREMISES AT 247 SCHOOL STREET, 2ND FLOOR, LOWELL, MASSACHUSETTS; | ) ) 17-MJ-1225-DLC ) |
| 6.  MONITOR, MAINTAIN, REPAIR, AND REMOVE A GLOBAL POSITIONING SYSTEM MOBILE TRACKING DEVICE ON A 2004 GRAY TOYOTA CAMRY, MA REG. # 6BWD30, VIN # JTDBE32K440274334. | ) ) 17-MJ-1226-DLC ) ) ) |

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT, SEARCH WARRANTS, AND A GPS TRACKING WARRANT

I, Task Force Officer Michael J. Shinners, being duly sworn, depose and state as follows:

## I. <u>INTRODUCTION</u>

1.      I have been employed as a police officer by the Haverhill Police Department for approximately nine years, currently serving there as a Detective.  I have been assigned to the narcotics unit at the Haverhill Police Department since August 2012.  I am also assigned to the U.S. Drug Enforcement Administration ("DEA")/Cross Border Initiative as a Task Force Officer.

2.      As a Task Force Officer of the DEA, I am authorized to investigate violations of the law of the United States, including violations of the federal drug laws in Title 21 of the United States Code.  As a deputized DEA Task Force Officer, I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516, Title 18, United States Code.  I am also a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

3.      Between January 2004 and December 2008, while on active duty in the U.S. Coast Guard, I was part of a boarding team composed of other active duty members and agents from federal, state, and local law enforcement agencies.  The boarding team targeted illegal activities of vessels in transit in U.S. waterways, often in connection with the transportation of narcotics.  Boarding team members are trained in the identification and interdiction of drug activity.  I received approximately 40 hours of training in the identification of narcotics and the use of narcotics identification kits.  I boarded over 150 vessels.

4.     I attended the Boston Police Academy from December 2008 until June 2009.  I graduated from the Boston Police Academy and received the Hogan Award for the highest academic score.  I received the Haverhill Police Officer Of The Year award in 2012.

5.     In September of 2013, I attended a CelleBrite certification class (24 hours of mobile device training and certification on the CelleBrite UFED device).  I was certified on the UFED Logical system and the UFED Physical Analyzer program.  The UFED software is used to retrieve stored data from mobile devices.

6.     In December of 2013, I completed a Bachelor's Degree in Criminal Justice at the University of Massachusetts-Lowell campus.

7.     In September of 2015, I attended an 80-hour training provided by the DEA.  I have also received training on the cultivation and management of confidential sources.

8.     I have conducted hundreds of controlled buys while managing informants and have conducted undercover buys in the Haverhill and Lawrence area.  During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods they use to package, store, and distribute narcotics.  I have participated, in hundreds of narcotics investigations involving heroin, fentanyl, cocaine, cocaine base ("crack"), marijuana, methamphetamine, oxycodone, OxyContin, and other controlled substances.  I personally have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, using confidential informants, acting in an undercover capacity, conducting court-authorized interceptions of wire and electronic communications, and preparing and executing arrest and search warrants.

9.     Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics

3

and to collect, expend, account for, transport, and launder drug proceeds.  I am also familiar with the manner in which narcotics traffickers use personal and rented cars and trucks, common carriers, mail and private delivery services, and a variety of other motor vehicles to: (a) meet with co-conspirators, customers, and suppliers; (b) transport, distribute, and purchase narcotics; (c) transport funds used to purchase narcotics; and (d) transport the proceeds of narcotics transactions.

10.     Based on my training and experience, narcotics trafficking typically involves the local, interstate, and international movement of illegal drugs to distributors and co-conspirators at multiple levels and the movement of the proceeds of narcotics trafficking among multiple participants including suppliers, customers, distributors, and money launderers.  Within the United States and the District of Massachusetts, illegal drugs and drug money are most often transported in motor vehicles.  Consequently, the location of vehicles used by narcotics traffickers and those working with them can be instrumental in identifying and intercepting shipments of illegal drugs and drug proceeds.

11.     More broadly, based upon my training and experience, tracking drug traffickers in motor vehicles frequently leads to evidence of narcotics and money laundering offenses, including, but not limited to: (a) the identification of potential criminal associates, such as criminal co-conspirators, suppliers of illegal narcotics, and money launderers; (b) the identification of physical locations at which illegal drugs are offloaded, stored, and/or distributed, including residences, businesses, commercial storage facilities, warehouses, and ports; and/or (c) the identification of locations where drug proceeds are stored, deposited, concealed, used in monetary and financial transactions, and laundered, including private businesses, banks, wire-remitter businesses, and other financial institutions.

12.     Based on my training and experience, tracking narcotics traffickers in motor

vehicles often corroborates and verifies information and investigative leads derived from other investigative techniques including informants, wiretaps, and visual surveillance.

## II.   <u>PURPOSE OF THE AFFIDAVIT</u>

I am submitting this affidavit for three reasons:

    a.  To support an application for a criminal complaint charging DOMINGO GARCIA SUERO with:

        i.  falsely representing, with intent to deceive, a number to be the social security account number assigned by the Commissioner of Social Security to him, in violation of 42 U.S.C. § 408(a)(7)(B); and

        ii.  possession with intent to distribute and distribution of Fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) (thereinafter "**Target Offenses**"); and

    b.  To support applications for the issuance of search warrants authorizing the search of:

        i.  23 Hamilton Avenue, Basement Apartment, Haverhill, MA;
        ii.  247 School Street, 2nd Floor, Lowell, MA;
        iii.  316 Adams Street, Apt. #189, Lowell, MA (thereafter "**Target Premises**"); and
        iv.  2004 Gray Toyota Camry, Massachusetts Registration 6BWD30 and Vehicle Identification Number JTDBE32K440274334 (thereinafter "**Target Vehicle**");

    c.  To support an application for an Order, pursuant to Rule 41(e)(2)(C) and Title 18, United States Code, Section 3117, authorizing agents of the DEA to monitor, repair, and use a previously installed real-time Global Positioning System ("GPS") mobile tracking device for 45 days on the Target Vehicle located in the District of Massachusetts for the purpose of monitoring and recording data regarding the movement of this motor vehicle both inside and outside the District of Massachusetts.

13.    As will be explained more fully below, DOMINGO GARCIA SUERO sold what I believe to be, based on my training and experience, Fentanyl and oxycodone pills to a Confidential Source ("CS"), who was acting under law enforcement supervision.  Based on the facts submitted below, the investigation also determined that DOMINGO GARCIA SUERO submitted a driver's

license application to the Massachusetts Registry of Motor Vehicles using identity and a social security number that does not belong to him.

14.     As a result, and as will be discussed below, I submit there is probable cause to believe that the Target Vehicle and Premises contain records and other evidence of the following offenses: (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); and/or (b) misuse of a social security account number, in violation of 42 U.S.C. § 408(a)(7)(B), as described below.

15.     I submit there is also probable cause to believe that the Target Vehicle is being used and will be used to facilitate the commission of the offenses in violation of 18 U.S.C. § 841(a)(1), and that the data obtained from the GPS device about the geographic location of the Target Vehicle will constitute and/or will lead to evidence, fruits, and instrumentalities of the aforementioned offense as well as to the identification of the individuals who are committing those and related crimes.

16.     I have personally participated in the investigation since June 2017.  I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of telephone and other records related to this investigation; (c) information provided to me orally and in writing by other law enforcement agencies; and (d) my experience and training as a criminal investigator.  Among other various information available to me, I am familiar with the investigation by Special Agent Roberto Coviello, Office of Inspector General, U.S. Department of Health and Human Services, into the true identity and immigration history of GARCIA SUERO.  I have not included each and every fact known to me and other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance

of the requested criminal complaint and search warrants.

### III.   IDENTITY OF GARCIA SUERO

17.     Special Agent Coviello reviewed documents contained within the United States Department of Homeland Security, Citizenship and Immigration Services ("CIS") alien file for DOMINGO GARCIA SUERO, file number Axxxxx314.  This review revealed that on January 22, 1997, law enforcement in Puerto Rico encountered one DOMINIGO GARCIA SUERO, a national of the Dominican Republic, in Puerto Rico.  The alien file included a fingerprint card, which contained fingerprint impressions that were obtained from DOMINGO GARCIA SUERO as a result of the encounter, and two photographs of an individual that were stapled to the jacket of the alien file.

18.     Also contained within the DOMINGO GARCIA SUERO alien file was a copy of a Dominican Republic passport bearing the name DOMINGO GARCIA SUERO and a photograph.  Special Agent Coviello compared the photograph appearing on this Dominican Republic passport with the two photographs that were stapled to the jacket of the alien file for DOMINGO GARCIA SUERO and determined that these photographs appeared to depict the same individual.

19.     The DOMINGO GARCIA SUERO alien file does not state that DOMINGO GARCIA SUERO ever became a citizen of the United States or has any current legal status in the United States.  The DOMINGO GARCIA SUERO file contains an order of removal and deportation, dated August 20, 1998.

IV.   **PROBABLE CAUSE TO BELIEVE THAT TARGET OFFENSES WERE COMMITTED**

    A.   ***Probable Cause To Believe That GARCIA SUERO Misused a Social Security Account Number in Violation of 18 U.S.C. § 408(a)(7)(B).***

20.   Special Agent Coviello determined that, according to the Massachusetts Registry of Motor Vehicles ("RMV"), since October 21, 1998, the RMV has received at least five initial, renewal, or reinstatement applications for Massachusetts driver's license number Sxxxxx978 in the identity of "Marcelo Perez," date of birth xx/xx/1961, Social Security number xxx-xx-6971 (hereinafter, "the Perez identity").   RMV records reveal that the applicant was photographed on three separate occasions in connection with these applications on October 21, 1998, August 18, 2005, and December 7, 2009.   Special Agent Coviello compared these three photographs with the photographs contained within the DOMINGO GARCIA SUERO alien file and determined that they all appear to depict the same person.

21.   As a result of the applications for Massachusetts driver's license number Sxxxxx978, the RMV issued Massachusetts driver's licenses to GARCIA SUERO featuring what appears to be DOMINGO GARCIA SUERO's photographs but in the Perez identity.   The most recent driver's license was issued by the RMV on or about June 18, 2015.

22.   Special Agent Coviello reviewed the RMV license renewal application in the name of "Marcelo Perez," dated June 4, 2015.   The application contains social security number xxx-xx-6971, date of birth xx/xx/1961, a statement that the applicant is a citizen of the United States, and a registration to vote.

23.   Special Agent Coviello reviewed U.S. Social Security Administration records for social security number xxx-xx-6971.   U.S. Social Security Administration records show that this social security number is assigned to an individual from Puerto Rico, Marcelino Perez Canales,

whose date of birth is xx/xx/1961, the same date of birth associated with the Massachusetts driver's licenses issued in the Perez identity.

24.     The Massachusetts Automated Fingerprint Identification System ("AFIS") is a system administered by the State Identification Section of the Massachusetts State Police ("MSP-SIS").  AFIS is used to store and identify fingerprint records submitted to MSP-SIS by contributing agencies, such as police departments and other law enforcement agencies. When fingerprints submitted to MSP-SIS match fingerprints that are already contained in AFIS, the fingerprint records and details of the encounter are linked together in a record referred to as an individual's "State RAP Sheet."

25.     According to records from the Haverhill Police Department and MSP-SIS, an individual using the Perez identity was arrested by the Haverhill Police Department on January 14, 2010.  As a result of the arrest, the individual was fingerprinted and photographed by the Haverhill Police Department.  That same day, the individual was also fingerprinted and photographed by the Essex County Sheriff's Department.

26.     According to AFIS, the fingerprints obtained by the Haverhill Police Department and the Essex County Sheriff's Department on January 14, 2010 are both linked to the same State RAP Sheet record, indicating that the fingerprint impressions were made by the same individual.

27.     Special Agent Coviello compared the photographs taken by the Haverhill Police Department and the Essex County Sheriff's Department with the photographs contained within the DOMINGO GARCIA SUERO alien file.  Special Agent Coviello also compared these photographs to the photographs taken by the RMV in connection with applications for the Massachusetts driver's license in the Perez identity.  Special Agent Coviello determined that all of the photographs appear to depict the same person.

28.    In September 2017, the Homeland Security Investigations Forensic Laboratory compared the fingerprints obtained by the Haverhill Police Department during the January 2010 arrest of an individual using the Perez identity with the fingerprints obtained during DOMINGO GARCIA SUERO's encounter with law enforcement officers in Puerto Rico on January 22, 1997. The laboratory concluded that the same individual made both sets of fingerprint impressions.

29.    Thus, I submit there is probable cause to believe that GARCIA SUERO, with intent to deceive, falsely represented in his June 4, 2015 RMV driver's license renewal application a number to be the social security number assigned to him by the Commissioner of Social Security, in violation of 42 U.S.C. § 408(a)(7)(B).

### B.    Probable Cause To Believe That GARCIA SUERO Possessed With Intent to Distribute and Distributed Fentanyl, a Schedule II Controlled Substance, in Violation of 21 U.S.C. § 841(a)(1)

21.    Starting in June 2017, a Confidential Source ("CS") provided information to law enforcement about a Hispanic male known to the CS as "Jose Garcia," later determined to be GARCIA SUERO, who, according to the CS, sold Fentanyl, heroin, and cocaine.   The CS has been registered with the DEA since June 2017.   The CS wishes to remain anonymous out of concern for the CS's and his/her family's safety; however, the CS has stated that he/she will testify if necessary.   The CS has no known criminal record or pending criminal cases.   The CS has provided law enforcement with reliable and independently corroborated information in this investigation and another past investigation.   The CS participated in controlled buys of narcotics from the individual believed to be GARCIA SUERO and received monetary compensation for these controlled purchases.

22.    The CS stated that "Jose Garcia" owns a Jeep Grand Cherokee and a Toyota Camry. The CS provided a phone number of xxx-xxx-1859 for "Jose Garcia."   The records check with the

phone service provider established that this phone's unique International Mobile Subscriber Identity ("IMSI") is xxxxxxxxx567788.

23.   Based on the information provided, in part, by Special Agent Coviello, "Jose Garcia" was determined to be GARCIA SUERO.

24.   A Massachusetts board of probation check shows that GARCIA SUERO, under the Perez identity, has convictions for firearm and drug distribution related charges, including Heroin and Cocaine.

25.   According to the RMV, an individual using the Perez identity, whom law enforcement identified as GARCIA SUERO, resides at 23 Hamilton Avenue in Haverhill, Massachusetts, and owns the Target Vehicle.

26.   Law enforcement has been tracking the Target Vehicle pursuant to a state, and subsequently federal (17-MJ-6348-MPK), GPS Tracking Warrant.  The federal warrant expires on December 17, 2017.

27.   Acting under law enforcement supervision, the CS made four controlled purchases from GARCIA SUERO on September 28, 2017, October 10, 2017, October 26, 2017, and November 21, 2017, of what I believe to be, based on my training and experience, controlled substances.  In each instance, under the direction and control of law enforcement agents, the CS placed a recorded phone call to GARCIA SUERO to arrange the purchase of narcotics at a predetermined location near 180 Merrimack Street, Haverhill, MA.  Law enforcement then searched the CS for contraband with negative results and provided the CS with U.S. currency to purchase the narcotics from GARCIA SUERO.  Law enforcement surveilled GARCIA SUERO leave from his residence at 23 Hamilton Avenue, Haverhill, MA, meet the CS at the predetermined location, and eventually return to 23 Hamilton Avenue in the Target Vehicle.  After each

transaction, law enforcement obtained from the CS what appeared to be, based on my training and experience, narcotics, which I logged into evidence and sent to the DEA Northeast Laboratory for testing.  Law enforcement monitored and recorded each controlled buy.

### Controlled Buy on September 28, 2017

30.     Prior to September 28, 2017, GARCIA SUERO agreed to sell a quantity of Fentanyl to the CS.  On September 28, 2017, under the circumstances described above, the CS purchased from GARCIA SUERO, for $1,200, what I believe to be, based on my training and experience, about 20 grams of Fentanyl.   Law enforcement observed GARCIA SUERO leave 23 Hamilton Ave in the Target Vehicle and drive directly to 180 Merrimack Street.   Law enforcement then observed a hand-to-hand exchange between the CS and GARCIA SUERO.   Finally, law enforcement obtained from the CS a clear glassine bag containing a white powdery substance, which I logged and shipped to the DEA Northeast Lab for testing.  According to the CS, GARCIA SUERO had instructed the CS to "cut" the substance properly or people could die.  Based on my training and experience, the term "cut" refers to the dilution of narcotics.  The law enforcement observed GARCIA SUERO drive in the Target Vehicle to 23 Hamilton Avenue after the transaction.

### Controlled Buy on October 10, 2017

31.     On October 10, 2017, under the circumstances described above, the CS purchased from GARCIA SUERO approximately 20 grams of what I believed to be, based on my training and experience, Fentanyl, in exchange for $1,300.  GARCIA SUERO again drove from, and returned to, 23 Hamilton Avenue in the Target Vehicle.

**Controlled Buy on October 26, 2017**

32.     On October 26, 2017, under the circumstances similar to the ones described above, the CS purchased from GARCIA SUERO what I believed to be, based on my training and experience, approximately 10 grams of Fentanyl and 100 Oxycodone/Fentanyl pills for $1,650.00.

33.     Initially, under the direction of law enforcement, the CS ordered 10 grams of Fentanyl and 50 Oxycodone/Fentanyl pills from GARCIA SUERO using cell phone number xxx-xxx-1859.

34.     Prior to the prearranged meeting, law enforcement surveilled the Target Vehicle to identify GARCIA SUERO's source of supply.   GARCIA SUERO drove the Target Vehicle to, and parked at, a parking lot off Cross Street and Adams Street in Lowell, MA.   A Hispanic male, later identified as Elisaul CARABALLO, exited a minivan behind the Target Vehicle. CARABALLO and GARCIA SUERO entered 316 Adams Street, Lowell, MA.   Several minutes later, CARABALLO and GARCIA SUERO walked out of 316 Adams Street.   GARCIA SUERO entered the driver's side of the Target Vehicle.   A Lexus Sedan, later identified as registered to CARABALLO, arrived. CARABALLO entered the passenger side of the Lexus Sedan, which drove away from the parking lot.   The Target Vehicle and GARCIA SUERO remained in the parking lot.

35.     At this point, under the direction of law enforcement, the CS called GARCIA SUERO using the same phone number as before and ordered 50 additional pills for a total of 100 Oxycodone/Fentanyl pills.  Law enforcement observed CARABALLO exit the Lexus Sedan on Fletcher Street in Lowell and walk back to where GARCIA SUERO was waiting outside 316 Adams Street.   CARABALLO and GARCIA SUERO entered and shortly thereafter exited 316

Adams Street.  Both entered the Target Vehicle, which GARCIA SUERO drove to the area of 247 School Street, Lowell, MA.

36.     CARABALLO exited the Target Vehicle at the intersection of School Street and Cross Street. CARABALLO then walked across School Street to a parked Jeep Cherokee registered in the Perez identity.

37.     According to a prior debrief of the CS, GARCIA SUERO said that his source of supply used a vehicle he owns.

38.     CARABALLO then walked into 247 School Street.  GARCIA SUERO drove the Target Vehicle, first to 23 Hamilton Avenue in Haverhill, MA, and then to the predetermined location at 180 Merrimack Street.  There, he entered the CS's vehicle.

39.     The CS reported to law enforcement that in his vehicle he gave GARCIA SUERO $1,650 in DEA funds in exchange for 100 pills and the bag of tan/white powder.  Law enforcement retrieved the suspected narcotics and sent them to the DEA Northeast region laboratory for analysis.   The lab returned the results for the 100 pills, identifying them as containing approximately 15.391 grams in net weight of Fentanyl.  The lab also returned the results for the powder, identifying it as Fentanyl with an approximate net weight of 9.947 grams.

**Surveillance of CARABALLO and 247 School Street on November 2, 2017**

40.     On November 2, 2017, at approximately 2:00 PM, law enforcement surveilled 247 School Street, Lowell, MA.  A male, later identified as Daniel Pina-Castillo, exited 247 School Street and entered the Jeep Cherokee registered under the Perez identity.   Law enforcement arrested Pina-Castillo for unlicensed operation of a motor vehicle.  CARABALLO approached the police on foot during the traffic stop and asked to take possession of the Jeep Cherokee, showing

a valid Massachusetts license bearing his name. The RMV lists CARABALLO's address as 247 School Street, 2nd Floor, Lowell, MA.

41.     Pina-Castillo told the police that he lived with his cousin CARABALLO and CARABALLO's mother at 247 School Street, 2nd floor, Lowell, MA.

**Controlled Buy on November 21, 2017**

42.     On November 21, 2017, the CS, under the circumstances similar to the ones described above, purchased from GARCIA SUERO what I believe to be, from my training and experience, approximately 20 grams of Fentanyl and 50 Oxycodone/Fentanyl pills for $1,800.00 in DEA funds.

43.     Law enforcement surveilled the Target Vehicle and CARABALLO prior to the controlled purchase. GARCIA SUERO drove the Target Vehicle to the parking lot outside 316 Adams Street in Lowell, MA. Law enforcement also observed two Hispanic males, including CARABALLO, exit 247 School Street and enter the Lexus Sedan. GARCIA SUERO and CARABALLO ultimately met on Adams Street. Then, they entered, and shortly thereafter exited, 316 Adams Street. GARCIA SUERO entered the driver's side of the Target Vehicle and CARABALLO entered the passenger's side. CARABALLO exited the Target Vehicle on Loring Avenue near School Street, while GARCIA SUERO drove to 23 Hamilton Avenue in Haverhill, MA.

44.     Law enforcement observed GARCIA SUERO drive from 23 Hamilton Avenue to 180 Merrimack Street in the Target Vehicle. GARCIA SUERO exchanged items with the CS. GARCIA SUERO eventually drove the Target Vehicle back to 23 Hamilton Avenue.

45.     The CS reported that GARCIA SUERO had provided 50 pills and the bag of tan/white powder exchanged for $1800.00 in DEA funds. The DEA Northeast regional lab

determined that the 50 pills contained Fentanyl with the net weight of approximately 7.685 grams. The lab also returned the results for the powder, identifying it as Fentanyl with an approximate net weight of 20.168 grams.

46.     Therefore, I submit there is probable cause to believe that GARCIA SUERO and CARABALLO possessed with intent to distribute and distributed Fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1).

## V.     PROBABLE CAUSE TO SEARCH TARGET VEHICLE AND TARGET PREMISES

### A.     *Gray Toyota Camry, Massachusetts Registration 6BWD30 and Vehicle Identification Number JTDBE32K440274334; and 23 Hamilton Avenue, Basement Apartment, Haverhill, Massachusetts*

47.     The investigation has identified 23 Hamilton Avenue located in Haverhill, Massachusetts as the primary residence used by GARCIA SUERO. GARCIA SUERO's Massachusetts RMV information, under the Perez identity, lists 23 Hamilton Avenue as the primary residence.  As described above, during the investigation GARCIA SUERO proceeded directly to the meet location from 23 Hamilton Avenue prior to each controlled buy and then returned to that address in the Target Vehicle.  According to the GPS Tracking Device location information, the Target Vehicle remains parked at 23 Hamilton Avenue overnight.  The RMV records show that the Target Vehicle is registered in the Perez identity.

48.     National Grid Utilities records list 23 Hamilton Avenue as a two unit building. According to the same records, GARCIA SUERO does not have an account at 23 Hamilton Avenue under his name or any known aliases that he utilizes.

49.     According to the CS, GARCIA SUERO made statements that he rents an apartment in the basement area of 23 Hamilton Avenue.

50.     During surveillance, law enforcement observed GARCIA SUERO walk on the right rear side of 23 Hamilton Avenue toward the rear, where he appears to reside.   During surveillance, law enforcement did not observe GARCIA SUERO enter 23 Hamilton Avenue through the front entrance.

51.     Therefore, I submit there is probable cause to believe that 23 Hamilton Avenue and the Target Vehicle contain evidence of drug trafficking activity, to include, Fentanyl and drug processing and packaging paraphernalia and materials, as well as drug proceeds and drug related records and receipts.

52.     Special Agent Coviello has conducted numerous investigations involving misuse of an identity and identification documents and seized true and false identification documents from residences and motor vehicles of targets suspected of fraudulent use of another's identification. Based on my and Special Agent Coviello's training and experience, individuals hold on to their true and fraudulent identification documents and store them at their residences and vehicles.

53.     Thus, I submit there is also probable cause to believe that 23 Hamilton Avenue and the Target Vehicle contain evidence of GARCIA SUERO's use of his true identity, as well as the false Perez identity and/or any other false identity, to include identification documents belonging to any person using the names Marcelo Perez, Marcelino Perez Canales, Jose Garcia, and Domingo Garcia Suero, or any variations thereon, including but not limited to, driver's licenses, vehicle registration and insurance information, state identification cards, Social Security cards, birth certificates, employee identification cards or badges, library cards, passports, visas, bank cards, credit cards, and health insurance cards.

54.     23 Hamilton Avenue is more fully described in **Attachment A-1**, and the items to be searched and seized at the Target Vehicle and 23 Hamilton Avenue are more fully described in **Attachment A-2**.

### B.   *316 Adams Street, Apt. #189, Lowell, Massachusetts*

55.     316 Adams Street is one of the entrances into a three-story building owned and operated by the Lowell Housing Authority.  The 316 Adams Street entrance provides access to six units, with unit 189 located on the right side of the second floor.  One of the six units is unoccupied.  I obtained identification information for the residents of the five occupied units from the Lowell Housing Authority.  I reviewed commercial databases for these identities and determined that, other than the resident in unit 189, these identities had no familial relation to CARABALLO.  Moreover, through these commercial databases, I obtained phone numbers associated with the identities of the residents in the five occupied units.  None of these phone numbers, other than the phone number associated with unit 189, appears in CARABALLO's toll records.

56.     The RMV and the Lowell Housing Authority records identify Isaura Santa as residing at 316 Adams Street, Apt. #189, Lowell, MA.  Santa is CARABALLO's sister according to the commercial database search, with the phone number xxx-xxx-0510.  The toll records for the phone number xxx-xxx-9411, which is billed to 247 School Street where CARABALLO resides, indicate that there were 18 calls between that number and phone number xxx-xxx-0510 between September 27, 2017 and October 26, 2017.

57.     Toll records for phone number xxx-xxx-9411, associated with CARABALLO, show that this number initiated a call to phone number xxx-xxx-0510, associated with Santa, on the date of the controlled buy on October 26, 2017.  The call took place shortly after the CS had

placed his initial order with GARCIA SUERO, which was approximately 21 minutes prior to GARCIA SUERO and CARABALLO meeting outside of 316 Adams Street.

58.     Based on the facts in this investigation and my training and experience, I believe that 316 Adams Street, Apt. #189, is a narcotics stash location CARABALLO uses to supply GARCIA SUERO with Fentanyl.   Law enforcement observed GARCIA SUERO and CARABALLO briefly visit 316 Adams Street prior to the two controlled buys from GARCIA SUERO.  For example, when, on October 26, 2017, the CS placed an additional order for 50 pills with GARCIA SUERO, law enforcement observed CARABALLO and GARCIA SUERO return to 316 Adams Street after they had visited the location when the CS placed the initial order.  On November 21, 2017, law enforcement again observed GARCIA SUERO and CARABALLO briefly visit 316 Adams Street before the controlled buy from GARCIA SUERO.

59.     Therefore, based on my training and experience and the facts in this investigation, I submit there is probable cause to believe that CARABALLO and GARCIA SUERO use 316 Adams Street, Apt. #189, Lowell, MA, as a narcotics stash location and that this location will contain evidence of drug trafficking activity, to include Fentanyl, drug processing and packaging paraphernalia and materials, as well as drug proceeds and drug related records.

60.     316 Adams Street, Apt. #189, Lowell, MA is more fully described in **Attachment B-1**, and the items to be searched and seized are described in **Attachment B-2**.

### C.   247 School Street, 2nd Floor, Lowell, Massachusetts

61.     The investigation has identified 247 School Street, 2nd Floor, Lowell, Massachusetts, as CARABALLO's primary residence. CARABALLO's active Massachusetts driver's license indicates that he resides at 247 School Street, 2nd Floor.   On November 2, 2017,

Pina-Castillo told the arresting officers that he resided with CARABALLO and CARABALLO's mother at 247 School Street, 2nd Floor.

62.　　GARCIA SUERO's phone toll records show that he contacts cell phone number xxx-xxx-9411.  The billing information for phone number xxx-xxx-9411 lists the billing address as 247 School Street, Lowell, MA.

63.　　Prior to the October 26, 2017 controlled buy from GARCIA SUERO, law enforcement observed GARCIA SUERO and CARABALLO exit 316 Adams Street, believed to be a narcotics stash location, and enter the Target Vehicle.  GARCIA SUERO drove CARABALLO to 247 School Street.  Then, GARCIA SUERO drove the Target Vehicle on his own to meet the CS at the predetermined location and sold to the CS what I believe to be Scheduled II controlled substances.

64.　　Prior to the controlled buy from GARCIA SUERO on November 21, 2017, law enforcement observed CARABALLO leave 247 School Street in the Lexus Sedan and drive to 316 Adams Street, where he met GARCIA SUERO.  Both entered and shortly thereafter exited 316 Adams Street.  GARCIA SUERO ultimately drove the Target Vehicle from 316 Adams Street to 23 Hamilton Avenue, and then to the predetermined meeting location where he sold the CS what I believe to be Scheduled II controlled substances.

65.　　Based on the facts in this investigation and my training and experience, I submit there is probable cause to believe that CARABALLO supplies GARCIA SUERO with Fentanyl and that CARABALLO obtains Fentanyl from 316 Adams Street, Apt. #189, Lowell, MA.  I submit there is also probable cause to believe that CARABALLO returns to 247 School Street, 2nd Floor with the proceeds of the sale of Fentanyl to GARCIA SUERO.

66.     Based on the facts in this investigation and my training and experience, I submit there is probable cause to believe that 247 School Street, 2nd Floor, Lowell, MA will contain evidence of drug trafficking activity, to include drug proceeds and drug related records and receipts.

67.     247 School Street, 2nd Floor, Lowell, MA is more fully described in **Attachment C-1**, and the items to be searched and seized are described in **Attachment C-2**.

## VI.   PROBABLE CAUSE TO MONITOR, REPAIR, AND REMOVE A GPS TRACKING DEVICE AFFIXED TO THE TARGET VEHICLE

68.     Based on the information provided in this affidavit, the United States requests that the Court issue a warrant authorizing members of the DEA or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to continue to monitor a tracking device previously affixed on the Target Vehicle, and to repair, replace, maintain and remove said tracking device from the Target Vehicle after the use of the tracking device has ended; and to monitor the tracking device for a period of 45 days following the warrant's issuance. To ensure the safety of the executing officers and to avoid premature disclosure of the investigation, the United States further requests the Court authorize replacement, maintenance, and removal of the tracking device during both daytime and nighttime hours.

69.     Because there is reasonable cause to believe that providing immediate notification would seriously jeopardize the investigation, the United States also requests that the warrant delay notification of the execution of the warrant for a period not to exceed 30 days after the end of the authorized period of tracking (including any extensions thereof), in accordance with 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3).

## VII.   Drug Traffickers' Use of Residences, Cell Phones, and Computers Generally

70.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered from the search of the drug-traffickers' residences:

a.      Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances.  Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

b.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

c.      Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

d.      Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

e.      Airbills, labels for overnight deliveries and Express Mail deliveries, receipts and other documents pertaining to such shipments.

f.      Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.   Such

identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

g.    Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of co-conspirators.

h.    Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords, and documents.

i.    Other electronic equipment such as computers and other removable media such as Compact Discs (CDs), Digital Video Discs (DVDs), memory sticks, memory cards, SanDisks, Mini SD cards, or Flash memory cards that would contain evidence of any of the above-listed items.

71.    Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers. Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

72.     Even when drug dealers store their drugs outside their residence, I know that they often will keep records relating to these offsite storage locations at their primary residence.  Such documents include rental or storage property agreements and receipts.

73.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances.

74.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use the proceeds to purchase legitimate investments or expensive jewelry and precious metals. In other instances, drug traffickers will combine the cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking and/or money laundering would also typically be maintained in residences.

75.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes or other containers so that other individuals who are at their residence do not discover these materials.

76.     Many drug dealers receive their drugs through overnight parcels and keep mailing labels and airbills both used and unused in their residence for future use.  Additionally, such drug traffickers often send the proceeds of their drug sales via overnight delivery, Western Union, and/or wire to their suppliers in order to pay for a continuing supply of drugs.  Such individuals will often maintain records of these transactions for a period of time in case there is a later dispute concerning what funds were transmitted and when.

77.     During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, I have learned from this and other investigations that records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of illegal drugs is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books and bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

78.     Based on training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking and money laundering activities with customers, suppliers, and other co-conspirators.  As discussed above, GARCIA SUERO

arranged to sell Fentanyl to the CS via use of a cell phone. GARCIA SUERO also communicated with a phone number that has a billing address at 247 School Street where CARABALLO lives. In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug dealers typically keep the phones in close proximity or at their residence. Additionally, in my experience, many drug dealers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences. As a result, it is common to recover not only paper records pertaining to the use of the cellular phone by drug dealers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug dealers' residences.

79.     Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on

personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device. Based on my training and experience, I know that many cellular telephones have the capabilities described above.

80.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices. I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell illegal drug typically use cellular telephones to communicate with their suppliers, their customers, and with other co-conspirators, and that they communicate both via both voice calls and via email and/or text messaging. I also know that persons who sell illegal drugs regularly keep records of their illegal activities. These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers. Individuals engaged in drug trafficking activities often take photographs of their closest confederates. Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on cellular telephone, electronic/digital storage device and/or a computer. In the case of electronic or digital media, the information can be maintained on the device itself or on portable digital storage media, making it easier to conceal. I know that individuals involved in the sale of drug are very secretive in their activity in an effort to avoid detection, arrest and prosecution, and such persons usually are careful to deal only with someone they know, or who have been introduced to them by someone they know. Additionally, in the conduct of their activities, they frequently employ code words or colloquial jargon when writing, texting or speaking on the telephone or in

person, being careful to avoid the use of actual names of persons or narcotic substances, which, if overheard or seen, would be incriminating to themselves or their criminal associates.

81.     Additionally, I know that many drug traffickers often use computers, cellular telephones, or other electronic devices having internet capabilities in order to communicate quickly and economically with their suppliers via the internet and/or email.  Additionally, when the value of the drugs being ordered and transported is large, drug traffickers will often use a computer, cellular telephone, or other electronic devices having internet capabilities to monitor the progress of the package while en route via databases such as the USPS Track 'n Confirm database and/or to receive emails tracking the progress of packages containing drugs or drug proceeds that have been shipped.  I am also aware that individuals frequently use computers to create and store records of their actions by communicating with others through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can provide valuable evidence as to the locations where drug traffickers meet with co-conspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

82.     From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments A-2, B-2, and C-2 in computer hardware, computer software, computer-related documentation, and storage media.

28

83.     Based upon my training, experience, and information provided to me by others involved in the forensic examination of computers, I know that computer data can be stored in a variety of methods, including, but not limited to, within the memory of the device; within volatile memory; on removable media such as Compact Discs (CDs), Digital Video Discs (DVDs), memory sticks, memory cards, SanDisks, Mini SD cards, or Flash memory cards; within Flash memory; within Read Only Memory (ROM); within Random Access Memory (RAM); within dynamic RAM (DRAM); and on hard drives.   I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.   This is true because:

    a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.   Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

    b.     Even after files have been deleted, they can be recovered months or years later using forensic tools.   This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.   In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.     Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.   This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.   It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

    d.     Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## VII.    **CONCLUSION**

84.     As a result, and as will be discussed below, I submit there is probable cause to believe that the Target Vehicle and Target Premises contain records and other evidence of the following offenses: (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); and/or (b) misuse of a social security account number, in violation of 42 U.S.C. § 408(a)(7)(B), as described in this affidavit and Attachments A-1, A-2, B-1, B-2, C-1, and C-2.  I also submit there is probable cause to believe that GARCIA SUERO committed the Target Offenses.  I further submit the Target Vehicle is being used to facilitate the ongoing narcotics trafficking activities in the District of Massachusetts and that the data obtained from the GPS device about the geographic location of the Target Vehicle will constitute and/or will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

_____

Michael J. Shinners
Task Force Officer
Drug Enforcement Administration

Sworn and subscribed to before me this 15th day of December 2017, at Boston, Massachusetts

_____

The Honorable
United States Magistrate Judge
District of Massachusetts

30

## ATTACHMENT A-1
### (Description of 23 Hamilton Avenue, Basement Apartment, Haverhill, Massachusetts)

This address is described as a two-unit building three-stories in height, with the front of the building cladded with white-colored vinyl siding and black shutters and a gray asphalt roof. A porch is affixed to the front of the residence and the main front entry door is located on the porch. The main entry door is made of steel construction and is colored white, with a silver doorknob, and a glass half-circle window near the top of the door. The number "23" is affixed to the building several inches above the front door. The target apartment is located in the basement of the building, which can be accessed through the right rear doorway of the building. Two mailboxes are affixed to the front of the residence on each side of the stairs leading to the front porch.

**Photographs of 23 Hamilton Avenue, Haverhill, Massachusetts**





**ATTACHMENT A-2**
**(Items to be seized from 23 Hamilton Avenue, Basement Apartment, Haverhill,**
**Massachusetts and Gray Toyota Camry, Massachusetts Registration 6BWD30 and Vehicle**
**Identification Number JTDBE32K440274334)**

Items, documents, records, files, and other information that constitutes evidence of violations of 21 U.S.C § 841(a)(1) and 42 U.S.C. § 408(a)(7)(B), including:

1.    Controlled substances;

2.    paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices;

3.    books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances;

4.    personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to associates in the trafficking organization and to customers of the organization;

5.    evidence pertaining to obtaining, secreting, transfer, concealment, and/or expenditure of narcotics proceeds, such as: currency, currency counting machines, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers;

6.    retained copies of tax returns;

7.    documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

8.    cellular telephones, including cellular phone for phone number xxx-xxx-1859, International Mobile Subscriber Identity ("IMSI") is xxxxxxxxx567788.

9.    items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys; and

10.   electronic equipment, such as computers and other removable media, including but not limited to, Compact Discs (CDs), Digital Video Discs (DVDs), memory sticks, memory cards, ScanDisks, Mini SD cards, or Flash memory cards that would contain evidence of

any of the above-listed items.

11.     Identification documents belonging to any person using the names Marcelo Perez, Domingo Garcia Suero, Marcelino Perez Canales, Jose Garcia, or any variations thereon, including but not limited to driver's licenses, state identification cards, health insurance cards, Social Security cards, birth certificates, employee identification cards or badges, library cards, passports, visas, bank cards, and credit cards.

12.     Massachusetts Registry of Motor Vehicles or Social Security documents and records belonging to any person using the names Marcelo Perez, Domingo Garcia Suero, Marcelino Perez Canales, Jose Garcia, or any variations thereon.

## ATTACHMENT B-1
### (Description of 316 Adams Street, Apt. #189, Lowell, Massachusetts)

This address is described as a three-story, multi-unit building with a red brick exterior, white trim, and gray entry doors. The building has gray colored asphalt roof shingles. The front door to the building is located in the exterior center of the building on the Northwest side of the building facing The Murkland Elementary School. A "316" is affixed to the top half of the door in black lettering. The main access door to the common hallway is colored gray and contains a rectangular pane of glass on the left half of the door. The door to apartment #189 is located on the second floor of the building on the right side. The door is dark in color and has a silver doorknob and deadbolt on the right hand side of the door.

**Photographs of 316 Adams Street, Apt. #189, Lowell, Massachusetts**



316 Adams is located in the center of the top building where the red arrow is pointing. Red dot indicates where GARCIA SUERO parks when meeting CARABALLO.

## **ATTACHMENT B-1 CONTINUED**
### **(Description of 316 Adams Street, Apt. #189, Lowell, Massachusetts)**

**Photographs of 316 Adams Street, Apt. #189, Lowell, Massachusetts**



# ATTACHMENT B-2
### (Items to be seized from 316 Adams Street, Apt. #189, Lowell, Massachusetts)

Items, documents, records, files, and other information that constitutes evidence of violations of 21 U.S.C § 841(a)(1):

1.  Controlled substances;

2.  paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices;

3.  books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances;

4.  personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to associates in the trafficking organization and to customers of the organization;

5.  evidence pertaining to obtaining, secreting, transfer, concealment, and/or expenditure of narcotics proceeds, such as: currency, currency counting machines, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers;

6.  retained copies of tax returns;

7.  documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

8.  cellular telephones;

9.  items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys; and

10. electronic equipment such as computers and other removable media, including but not limited to, Compact Discs (CDs), Digital Video Discs (DVDs), memory sticks, memory cards, ScanDisks, Mini SD cards, or Flash memory cards that would contain evidence of any of the above-listed items.

**ATTACHMENT C-1**
**(Description of 247 School Street, 2nd Floor, Lowell, Massachusetts)**

This address is described as a four-unit building three-stories in height, with the front of the building cladded with tan-colored vinyl siding and green shutters and a dark gray asphalt roof. A porch is affixed to the front of the residence and the main front entry door is located on the right side of the porch. The number "247" is affixed to the exterior of the building on the rights side of the main entry door indicating unit 247 is the right side of the building. The number "249" is located on the left side of the porch, indicating that unit 249 is the left side of the building. On the right side interior of the porch, two mailboxes are affixed to the interior wall. The target apartment is located on the second floor of the building, which can be accessed through the right front doorway of the building. A staircase in the common hallway leads to the second floor. The door to the second floor apartment is a white six panel door with a brass knob and deadbolt on the left hand side. A sign stating "Welcome San Miguel Family Day Care" is affixed to the top half of the door.

**Photograph of 247 School Street, 2nd Floor, Lowell, Massachusetts**



## ATTACHMENT C-1 CONTINUED
### (Description of 247 School Street, 2nd Floor, Lowell, Massachusetts)

**Photograph of 247 School Street, 2nd Floor, Lowell, Massachusetts**



## ATTACHMENT C-2
**(Items to be seized from 247 School Street, 2nd Floor, Lowell, Massachusetts)**

Items, documents, records, files, and other information that constitutes evidence of violations of 21 U.S.C § 841(a)(1):

1.  Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, and heat-sealing devices;

2.  books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, sale, and distribution of controlled substances;

3.  personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to associates in the trafficking organization and to customers of the organization;

4.  evidence pertaining to obtaining, secreting, transfer, concealment and or expenditure of narcotics proceeds, such as: currency, currency counting machines, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers.

5.  retained copies of tax returns;

6.  documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

7.  cellular telephones;

8.  items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys; and

9.  electronic equipment such as computers and other removable media, including but not limited to, Compact Discs (CDs), Digital Video Discs (DVDs), memory sticks, memory cards, ScanDisks, Mini SD cards, or Flash memory cards that would contain evidence of any of the above-listed items.